UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JEAN KARIM,                     )
                                )
            Petitioner,         )
                                )
        v.                      )        CIVIL ACTION
                                )        NO. 21-11458-WGY
REBECCA NAKATO,                 )
                                )
            Respondent.         )
_____)
```

YOUNG, D.J.                                    May 20, 2022

### FINDINGS OF FACT & RULINGS OF LAW

The Court enters the following findings of fact and rulings of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I.   INTRODUCTION

On September 7, 2021, petitioner Jean Karim ("Karim") filed a complaint against Rebecca Nakato ("Nakato") for return of a minor child (the "Minor") to the United Kingdom pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention"), as incorporated into United States law by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-10 (formerly cited as 42 U.S.C. §§ 11601-10).  See Verified Compl. & Pet. Return Minor Child ("Compl."), ECF No. 1.

On October 14, 2021, Karim filed a motion for a temporary
restraining order.  See Pet'r's Mot. Hague Convention Entry TRO
& Scheduling Expedited Hr'g, ECF No. 9.  At a hearing held on
October 18, 2021, the Court collapsed the motion with the trial
on the merits pursuant to Federal Rule of Civil Procedure 65(a).
See Electronic Clerk's Notes, ECF No. 14.  The Court held a
bench trial by video conference on February 28, 2022.  After
hearing testimony by both parties, the Court took the matter
under advisement, and ordered that the Minor's passport be
suspended pending resolution of the case.  See Electronic
Clerk's Notes, ECF No. 30.

The Court now enters the following findings of fact and
rulings of law.

II.   **FINDINGS OF FACT**

A.    **Karim and Nakato's Relationship**

Karim and Nakato met in Kampala, Uganda in 2012.
Unofficial Bench Trial Tr. Feb. 28, 2020 ("Trial Tr.") 15:10-11.
At the time, Karim was living in England, where he had obtained
citizenship, and Nakato was living in Uganda.  Id. 16:13-19,
21:4-11.  The couple was married in Kampala, Uganda by the
Kibuli Mosque on September 12, 2013.  Id. 15:24-16:2;
Uncontested Exs., Ex. 1, Marriage Certificate.  Nakato secured a
British "spousal visa" from her marriage to Karim; the document
has to be periodically renewed to remain in effect and expired

in April 2021 due to Nakato's failure to renew it.  Trial Tr. 23:9-24:5, 86:1-15, 133:22-134:4.

After their marriage, Karim and Nakato moved to Amsterdam, where the Minor was born; the family remained there a little less than a year.  Id. 16:20-25, 17:1-3, 17:15-24.

In September 2014, Karim, Nakato, and the Minor moved to London, England and began living in a one-bedroom flat.  Id. 20:1-20, 22:19-23:1.  During this period, Karim worked as a support worker in a rehabilitation center, and Nakato was not employed.  Id. 25:1-12.  In 2015, Nakato became pregnant again, but the pregnancy was terminated.  See id. 49:18-23.

At some point in 2016, Karim and Nakato moved to a new home in Peterborough, England.  Id. 103:22.  Nakato worked briefly at the end of 2019 for an Amazon Factory.  Id. 25:15-20, 26:7-8.  Around this time, Karim began working at a car company.  Id. 26:6-16.

In 2019, due to marital problems, Karim and Nakato began discussing the possibility of living separately.  Id. 55:11-23, 56:16-20.  In September 2020, Nakato left her shared home with Karim for the United States.  Id. 70:8-17, 74:23-75:9.  Nakato is currently residing in Woburn, Massachusetts and is seeking asylum from the United States; she is not employed but is seeking work.  Id. 85:10-25, 86:1-4.

        B.    **The Alleged Divorce**

    Karim and Nakato's marital status was a point of contention
during these proceedings.  Nakato claims that she is divorced
but concedes she never received a civil divorce.  <u>Id.</u> 86:21-25,
132:9-11.  Karim contends that he and Nakato are still married.
<u>Id.</u> 43:17-20.  Their disparate accounts are recited briefly
here.

        1.    **Nakato's Account**

    Nakato claims that she and Karim terminated the marriage
via an Islamic Divorce Application and Divorce Certificate.  <u>Id.</u>
86:23-25.  Nakato submitted two documents in evidence to this
effect -- Karim contests their authenticity -- (1) the Kibuli
Mosque Divorce Certificate, dated June 2, 2020, and witnessed by
Musa Mugumba (identifying the husband) and Ismail Bukenya
(identifying the wife), Contested Exs., Ex. A, Kibuli Mosque
Divorce Certificate; and (2) the Islamic Divorce Application
Form, purportedly signed by both Karim and Nakato on August 6,
2017, and witnessed by Abbey Rafsanjan ("Rafsanjan") and
Mustapha Ssali ("Ssali"), <u>id.</u> Ex. B, Kibuli Mosque Islamic
Divorce Appl. Form.  Nakato claims she was present when the
"Kibuli Mosque Divorce Application" was executed and asserts
that both she and Karim were physically together when the
document was signed.  Trial Tr. 87:19-25, 88:24-89:1-15.  After
transmitting these documents to the mosque in Uganda, Nakato

claims she received the Divorce Certificate by mail and that the divorce was finalized by June 2, 2020.  Id. 89:13-15, 90:21-91:5.

### 2.   Karim's Account

Karim denies ever being a participant in the signing or submission of these documents.  Id. 42:2-4.  He testified that none of the handwriting on the Kibuli Mosque Divorce Application Form is his, as evidenced by the fact that his signature changes throughout these documents.  Id. 39:13-25.

Furthermore, Karim asserts that not only has he never met one of the witnesses, Rafsanjan, but that Rafsanjan is currently Nakato's boyfriend.  Id. 40:19-41:2.  Nakato concedes that Rafsanjan is her current partner, but states that he was an old friend and that they were not in close contact at the time of the divorce.  Id. 120:21-121:15.  Nakato also admits that Ssali, the other listed witness, is her best friend's husband.  Id. 130:20-22.

### 3.   This Court's Findings

For at least three reasons, this Court does not credit the two contested exhibits that Nakato sought to submit in support of her divorce: (1) the Divorce Certificate and (2) the Islamic Divorce Application Form.

First, the documents include signatures for Karim that are not only inconsistent throughout the application, but also

inconsistent with the signature which he has testified is his authentic signature.[1]

Second, the two witnesses listed on the Application Form are -- according to Nakato's own testimony -- friends or connections of Nakato, and there is no evidence that Karim has ever had contact with either of these individuals.

Third, in her Asylum Application, filed on June 6, 2021 -- a year after her alleged divorce -- Nakato checked off the box indicating her marital status as "married."  Uncontested Exs., Ex. 11, I-589, Appl. for Asylum & Withholding Removal ("Asylum Appl.") 1.

In light of the fact that Nakato has provided no other evidence of her divorce beyond these contested exhibits, this Court finds that Nakato and Karim are not divorced.

## C.   **Allegations of Abuse**

Nakato claims that she was both physically and verbally abused throughout her marriage and that she ultimately lost her second pregnancy due to Karim's physical abuse.

Prior to these proceedings, on June 6, 2021, Nakato applied for asylum in the United States; her Asylum Application was in large part based on allegations that she was abused by Karim.

---

[1] Karim testified that his true and accurate signature is present on the International Child Abduction and Contact Unit form.  Id. 45:7-19.

Trial Tr. 117:8-11; Asylum Appl. 1, 5.  Nakato filed this application nine months after her arrival to the United States and two months after receiving a letter from the State Department notifying her of Karim's initiation of Hague Convention proceedings.  Trial Tr. 117:12-118:10; Uncontested Exs., Ex. 7, April 15, 2021 Hague Convention Letter.  Nakato has not yet been granted asylum.  Trial Tr. 134:24-25.

Karim denies ever abusing Nakato and claimed at trial that her allegations were designed to "frame[]" him.  Id. 45:25-46:11.

This sub-section discusses Karim and Nakato's differing accounts with regard to (1) Nakato's assault allegations, and (2) the termination of Nakato's pregnancy.  It then (3) summarizes this Court's findings with respect to these alleged instances of abuse.

### 1.   Claims of Physical Abuse

#### a.   Nakato's Account

Nakato claims that from the moment they moved to England Karim began verbally abusing her, often in front of the Minor and others, including friends and family.  Id. 95:14-23, 92:16-19, 102:15-103:1.  She also testified that Karim was having an affair.  Id. 95:6-13.

Nakato testified to several scattered instances of abuse, an altercation that took place on Valentine's Day 2016, and a

physical fight after which she called the police (the "Incident").  At several points, Nakato's recounting at trial departed from her Asylum Application.

First, Nakato testified to several scattered instances of physical abuse.  At trial she claimed that, on one occasion, an argument escalated, and Karim threw a dinner she had cooked in her face.  Id. 97:17-20.  On several others, she testified that Karim would grab her and throw her on the couch in front of the Minor and that the Minor would cry.  Id. 104:8-17.[2]  She also testified that Karim pushed her head near a sink and threatened to kill her.  Id. 98:7-18.  During another argument, Nakato asserted at trial, Karim pulled her out of the bathroom while she was naked and dragged her on the floor, while the Minor was asking him to stop.  Id. 105:1-13.  The first two events are not discussed in Nakato's Asylum Application; the latter two are listed and are described differently from her trial testimony. See Asylum Appl. 12-14.  For example, the last instance is described as part of the Incident, not as an isolated instance of abuse.  See id.

---

[2] Nakato recounted several other instances of abuse in her Asylum Application including being forced out of Karim's car and punched in the face.  Asylum Appl. 12-14.  These instances were never mentioned at trial even after repeated questioning about the alleged abuse by both Nakato's counsel and Karim's attorney.

Second, Nakato testified to an altercation that she claims took place on Valentine's Day 2016.  Nakato stated at trial that on Valentine's Day Karim received a parcel containing a mug from a woman with whom he was having an affair.  Trial Tr. 103:2-104:7.  When Nakato confronted Karim she claims he shattered the mug, grabbed her from the neck, and told her, "I'm going to take you out of the house."  Id.  Nakato's recounting of this event in her Asylum Application was far different.  There, she claimed that on Valentine's Day Karim "punched [her] in the face with a closed fist[, ]she fell to the ground[, h]e then jumped on [her] and sat on [her] while [she laid] on the ground, and he held [her] to the ground for several minutes, [as] she flung her legs to try and free [herself]."  Asylum Appl. 12.

Third, Nakato testified to the Incident -- an altercation which took place on December 9, 2018, and escalated to Nakato calling the police.  At trial she recounted that Karim slapped her then locked her in the bathroom; when she was finally able to get out, she found Karim packing her things in the bedroom and telling her, "You're going to get out of the house today, you're not going to live in this house, one of us will die." Trial Tr. 98:19-99:6.  Afterwards, she claims, she ran to their neighbors' house to call the police.  Id.

This event is recounted in an **entirely different** manner in Nakato's Asylum Application.  There, she claimed that she was

[9]

treating her hair with chemicals, but that when she went to the bathroom to try and wash them out, Karim had locked her out. Asylum Appl. 14.  She pleaded with him to let her in because the chemicals were burning her skin.  Id.  He then opened the door, slapped her, grabbed her by the throat, tried to push her head in the open toilet, and then shoved her, which caused her to hit her head on the wall and fall.  Id.  Afterwards, he dragged her down the stairs and pulled her towel off, leaving her naked by the door.  Id.  He then threatened to cut off her head, pushed her inside a small storage room and locked her there.  Id. 15. She states she was in excruciating pain for hours and that when he finally let her out, she called the police, and he was arrested.  Id.  During this same altercation, Nakato claimed in her application, that Karim strangled her "to near death."  Id. 5.

### b.  Karim's Account

Karim denied ever physically or verbally abusing Nakato. Trial Tr. 46:1-11.

Karim also recounted the Incident which took place in December 2018 and led to his arrest.  Id. 64:1-67:5.  Karim testified that the altercation began when he was home cleaning the bathroom and Nakato asked if he could "get out," so that she could wash her hair.  Id. 65:1-21.  He claims that when he asked Nakato to wait five minutes she began yelling "you will come

out" and dragging him out of the bathroom as he struggled, pleading "let me go." Id. 66:1-9. He then alleges that Nakato followed him into the next room and continued their fight; she later picked up the phone and said she would call the police because he had assaulted her. Id. 66:11-24. At some point during this fight, Karim admits, he held the door to their bedroom closed with Nakato inside, preventing her from getting out, so that she could "calm down." Id. 79:1-25.

Karim was arrested in connection with Nakato's claims of assault in December 2018. Id. 64:1-9. He was charged with assault by beating and pled not guilty. Uncontested Exs., Ex. 12, Criminal Justice System Victim & Witness Hub, Notice of Trial. On February 14, 2019, the Huntingdon Law Court entered a verdict of not guilty. Trial Tr. 67:6-17; Uncontested Exs., Ex. 8, Mem. Entry Register Cambridgeshire Magistrates' Court ("Verdict Entry").

### 2. The Termination of Nakato's Pregnancy

In 2015, Nakato became pregnant with a second child. Trial Tr. 99:7-10. The parties' accounts diverge here as well, with Nakato claiming that Karim abused her during her pregnancy, causing a miscarriage, and Karim denying these allegations.

#### a. Nakato's Account

Nakato testified at trial that Karim's reaction when she informed him of her second pregnancy was "very bad." Id. 99:13-

18.   She alleges she told Karim she was willing to get an
abortion and that he arranged the abortion at a clinic.  Id.
99:20-100:1.  Before they ever made it to the clinic, however,
Nakato claims they had an argument during which Karim kicked her
in the stomach.  Id. 100:2-8.  After this incident, Nakato
asserts, she went to the clinic and "the abortion went through."
Id. 101:5-7.  According to Nakato, once she returned home, she
started bleeding profusely -- a condition that would last for
two months.  Id. 101:7-13.  Eventually, Nakato returned to the
abortion clinic, which advised her to go to the emergency room
because she "could die any minute."  Id. 101:13-25.  Nakato
testified that she stayed at the hospital for two weeks and
later returned to live with Karim.  Id. 102:1-6.

In tension with the above account, Nakato claimed in her
Asylum Application that she refused to get an abortion because
she feared medical complications and because her religion
prohibits it, but that Karim insisted she have one.  Asylum
Appl. 12.  She alleged Karim brought home a "concoction" for her
to drink in order to induce abortion and that when she refused,
he kicked her in the stomach repeatedly, and then grabbed her
head lowered it near the sink, while threatening to kill her.
Id.  She claimed she experienced heavy bleeding as a result of
the beating; later, she went to the hospital where doctors
confirmed she had a miscarriage.  Id.

### b.   Karim's Account

At trial, Karim testified that he and Nakato discussed the pregnancy and ultimately decided that abortion would be a viable option.   He testified it was Nakato who asked for the abortion and stated several reasons, including that she was too young, that she was not ready, that they were not financially stable enough, and that the one-bedroom flat would not be big enough for a second child.   Trial Tr. 50:1-7.   Karim testified that Nakato booked the abortion appointment and he drove her to the clinic and waited for her during the procedure in the waiting room with the Minor.   Id. 50:19-51:2, 51:5-6.   He confirms that Nakato later experienced medical complications from the procedure, according to Karim, including "nonstop bleeding" to the point that she had to go to the hospital; he claims he drove her to the hospital because he feared calling an ambulance would take too long.   Id. 52:1-11.   Nakato had to stay in the hospital overnight because of the abortion complications; Karim went home so that he could care for the Minor but returned the next morning and again to pick her up when she was discharged.   Id. 52:20-53:1.   Karim denies ever kicking Nakato or forcing her to drink anything to cause an abortion.   Id. 52:16-20.

### 3.   This Court's Findings

Nakato's claims of abuse -- at times difficult to decipher during her own trial testimony -- are in many instances

inconsistent with the events she described in her Asylum Application.  Nakato often recounted different actions (i.e. a grab instead of a punch or slap) and often exchanged details of one alleged instance of abuse for another when testifying at trial, as compared to her Asylum Application.  As to Nakato's second pregnancy, her accounts also differed greatly.  At trial, she stated Karim kicked her but that she ultimately went to a clinic where the abortion was conducted, whereas in her Asylum Application she claimed it was the assault that caused her to miscarry.  Given these obvious and at times extreme discrepancies, this Court cannot, without further supporting evidence, credit Nakato's physical abuse allegations.

Nakato has neither produced the police report filed in association with the Incident, nor offered any other evidence -- documentary or otherwise -- to support her allegations of physical abuse, such as pictures, medical records, texts, or emails.  Id.  119:4-120:2.  In fact, the medical records from Nakato's abortion neither identify complaints of physical abuse made by Nakato, nor make mention of bruising or any other physical signs of violence.  Uncontested Exs., Ex. 13, North Middlesex Hospital Rs. ("North Middlesex Hospital Rs.").

Furthermore, the little outside evidence that exists tends to weigh against a finding of physical abuse.  The Huntingdon Law Court entered a verdict of not guilty on the charges of

assault brought against Karim in connection with the Incident.
Trial Tr. 67:6-17; Verdict Entry.  In addition, the medical
records from Nakato's visit after her extensive bleeding state:
"[p]atient presented with heavy PV bleeding following medical
TOP >6 weeks ago."  North Middlesex Hospital Res.  "TOP" appears
to be the medical abbreviation used by this hospital for
"termination of pregnancy," a term employed to signify a medical
abortion rather than a miscarriage.  See Andrew Moscrop,
"Miscarriage or Abortion?" Understanding the Medical Language of
Pregnancy Loss in Britain a Historical Perspective, 39 Med.
Humanities 98, 98 (2013).  Given the hospital's access to
records from Nakato's visit to the abortion clinic and ability
to inspect and diagnose Nakato's condition, this weighs in favor
of finding that Nakato's pregnancy was terminated medically
rather than via a miscarriage.  Furthermore, temporally this
medical record confirms that Nakato's pregnancy was terminated
weeks before Nakato went to the hospital, which is consistent
with Karim's recounting of events -- not Nakato's allegations in
her Asylum Application, wherein she claims she went to the
hospital due to bleeding from a miscarriage caused by Karim
kicking her.

Therefore, this Court can credit neither Nakato's
allegations of physical abuse, nor her account that Karim's
assault ended her second pregnancy.  Instead, this Court finds

that Nakato underwent a medical termination of pregnancy followed by bleeding due to medical complications.

This Court does, however, find that there may have been instances of verbal abuse.  In fact, each party's testimony indicates that Karim often belittled Nakato and did not appreciate her contributions to the family.

D.   **The Minor Child**

Karim and Nakato have one child, the Minor, who was born January 17, 2014, in Amsterdam, Netherlands, and is currently eight years old.  Trial Tr. 17:4-16; Uncontested Exs., Ex. 2, Birth Certificate ("Birth Certificate").  The Minor has British citizenship due to Karim's citizenship status.  Trial Tr. 20:23-25.  The Minor also has a British passport, which Karim renewed a month before the child was removed; Nakato has at all times generally kept the passport and other documents in her possession.  Id. 24:8-20.

1.   **Early Life and Time Spent in England**

During their time in the Netherlands -- from the Minor's birth to their departure in 2014 -- Karim covered all of the Minor's expenses, including rent, clothes, and any medical costs not covered by public healthcare.  Id. 18:12-15.  Karim also assisted with the Minor's care when she was an infant: he would accompany her to medical appointments, help wash and change her, sometimes feed her, and put her to bed.  Id. 18:18-19:7.

[16]

In September 2014, when the Minor was just under one year old, the family moved to England.  Id. 20:1-20.  Throughout the entirety of the family's time residing together in England, Karim provided for the accommodations and most of the financial needs of the Minor.  Id. 18:10-15; 25:23-26:3.  Nakato did not share in common expenses but did contribute financially to the Minor's care when she was earning.  Id. 25:15-25.  In general, Karim and Nakato shared parental responsibilities when the Minor was a toddler, with the mother being the primary caretaker during the daytime, and the father intervening in the evenings when he returned from work.  Id. 26:17-21.  Even when both parents worked, Karim and Nakato retained this arrangement: the mother would supervise the Minor from 8:30 am to 6:30 pm (as Karim took the day shift at a car company), and the father would supervise the Minor after 6:30 pm until the mother returned home (as Nakato took the night shift at the Amazon Factory).  Id. 26:6-16.

In 2019, the Minor attended pre-school at Star Preschool. Id. 27:1-25.  Later the Minor began attending school full-time at the Lime Academy Parnwell, where she was enrolled to attend from October 1, 2019, to July 17, 2020.  Id. 28:1-29:4; Uncontested Exs., Ex. 3, Letter Lime Academy Parnwell.  Both parents appear to have been involved in the Minor's school life: both accompanied her to her first day of school and handled

[17]

school attendance thereafter -- with Karim being primarily
responsible for taking the Minor to school on Wednesdays (his
day off).  Trial Tr. 29:5-29, 30:19-25.  The Minor performed
successfully in school: her teachers gave her positive feedback
on her school report and noted how she "often" worked well with
others, worked well independently, and was "always respectful."
Id. 29:13-30:14; Uncontested Exs., Ex. 4, Lime Academy Parnwell
School Report.

Both parents would perform duties like food shopping and
cooking, buying clothes for the Minor, and bringing her to the
doctor when needed.  Trial Tr. 31:1-18, 32:18-21.  Karim
testified that he enjoys spending time with his daughter and
that he would take her to playgrounds and entertainment centers,
accompany her to see fireworks, and teach her how to swim.  Id.
32:5-17; see also Uncontested Exs., Ex. 9, Photographs (showing
images of Karim and the Minor at these outings).  During the
entirety of this period, Karim, Nakato, and the Minor resided
together.  Id. 30:15-18.

The Minor and Nakato took two trips without Karim during
this time -- one to Uganda for three months (around January
2017) and the other to the United States for around five or six
months (around July 2019).  Id. 34:6-35:25, 36:1-12, 107:19-21.
Nakato testified that Karim did not call or check in on the
child during their Uganda trip.  Id. 107:19-25.  Karim testified

[18]

that Nakato had told him the trip to the United States would
only last a couple of weeks and was a holiday to visit an old
friend in Texas.  Id. 36:13-37:6.  According to Karim, after two
weeks had elapsed, Nakato told him she planned on extending her
trip and that she would get a job in the United States; Karim
protested and raised legal concerns about Nakato overstaying her
visitor's visa.  Id. 37:9-25.  Nakato eventually returned and
she, Karim, and the Minor resumed living together.  Id. 38:1-15.

At some point in 2020, Nakato told Karim she was
considering moving to Derby -- a town one-hour[3] away from Karim
and Nakato's Peterborough residence -- and Karim testified that
he agreed to allow the Minor to live with Nakato in Derby and
attend school there.  Id. 56:3-21.  Karim claims that Nakato
told him she had enrolled the Minor in school at Derby.  Id.
57:1-4.

2.   **Removal**

On September 1, 2020, Nakato removed the Minor from the
United Kingdom.  Id. 70:8-17.  She traveled with the Minor to

---

[3] Karim's testimony regarding the distance from Derby to
Peterborough is contradictory.  Compare Trial Tr. 74:8-9
(suggesting that it would take him an hour to drive to Derby)
with id. 55:10-11 (stating that Derby is "like 4 miles . . .
like a 14-minute drive from where [he is]").  Given the distance
between Peterborough and Derby, this Court finds that an hour is
a more accurate representation of the likely commuting time.
See Fed. R. Evid. 201 (b)(2).

the United States via Aruba.  Id. 111:22-112:2.  Nakato and the

Minor stayed in Aruba for two weeks in a hotel.  Id. 128:9-11.

Karim testified that on September 1, 2020, he went to work

as normal, and that when he left, his wife and child were still

sleeping.  Id. 70:11-18, 73:9-20.  The prior evening, he, Nakato

and the Minor had dinner together and all slept in the family

home; this was the last time he saw and spoke to Nakato and the

Minor before their departure.  Id. 72:2-10, 73:15-20.  Upon his

return from work on September 1st, Karim found that all of

Nakato and the Minor's belongings had been removed from the

home.  Id. 70:11-18, 73:9-20.

Karim testified that he assumed Nakato had taken the Minor

to Derby; he sent her an email asking her to call him when she

had settled in so that they could "amicably" decide an

arrangement for splitting time with the Minor.  Id. 74:1-15.  He

testified that at no point did he and Nakato discuss the

specifics of the move to Derby, but that they had agreed they

would share time with the Minor.  Id. 70:15-18, 71:3-9.

Karim claims that at some later date in September 2020 he

discovered that the Minor was not attending school in Derby, as

the Minor's school contacted him due to her extended absence.

Id. 57:1-11, 59:10.  The head teacher at Lime Academy notified

Karim that the Minor was not attending school in England at all

at that time -- Lime Academy would have been notified had the

Minor's educational number been registered at another
educational institution.  Id. 57:12-25.  According to the
school's protocol, the head teacher then notified the
authorities, who later went to Karim's workplace to determine
the Minor's whereabouts.  Id. 58:1-25.

At this point, Karim reached out to Nakato to locate her
and the Minor: calls did not go through -- the ring tone sounded
as though the number was out of range (or out of the country) --
and Nakato did not respond to any email messages.  Id. 59:13-25,
62:4-19.  Karim spoke with the police, who promised to
investigate.  Id. 62:19-25.  Karim testified that the police
initially were not concerned and did not believe the child had
been abducted.  Id. 63:1-9.

Karim stated he did not have proof the Minor was in the
United States until a friend of his sent him pictures from
Facebook of the child in America.  Id. 74:23-75:9.  Karim showed
the police these pictures and, at this time, the police
expressed concerns of abduction.  Id. 75:13-21.

Nakato did not call or email Karim upon her arrival to the
United States.  Id. 128:19-25.  Nakato claims she later notified
Karim of her arrival via emails to which Karim did not respond.
Id. 113:8-15.  Nakato, however, provides no documentary proof of
these emails, and Karim claims he did not hear from Nakato until
January 2021, when she reached out asking for some money; he

refused her request, as he intended to engage in legal action to recover the Minor, so she disappeared.  Id. 76:7-77:4.

Before taking the Minor to the United States, Nakato never notified Karim that she intended to move to the United States to seek a new life.  See id. 54:10-14.  Nakato also never informed Karim of her intent to move the Minor to the United States, nor did Karim ever consent to Nakato doing so.  Id. 74:16-22.

Karim filed an application form with the International Child Abduction and Contact Unit on January 14, 2021, seeking the return of the Minor.  See Uncontested Exs., Ex. 6, International Child Abduction & Contact Unit Appl. Form ("ICACU Appl. Form") 1.  Karim's International Child Abduction and Contact Unit Application Form recounted the facts in a manner consistent with his testimony at trial; in the form, Karim also stated that he is "the legal father to [the Minor]," he is listed on the birth certificate, and he is her registered guardian in the United Kingdom.  Id. 10.

### 3.   Life in the United States

Nakato and the Minor currently reside with Nakato's partner, Rafsanjan.  Trial Tr. 120:19-23.  They have lived with Rafsanjan for almost two years -- that is, since their arrival to the United States.  Id. 129:2-12.  Nakato notified Rafsanjan she would be staying with him in July of 2020, about two months prior to her arrival.  Id. 129:13-21.  The Minor is currently in

second grade at Hurld Wyman Elementary School in Woburn, Massachusetts.  Id. 114:14-17.  Nakato testified that the Minor is "doing very well" in school and that "she has [] friends and [] cousins" in the area.  Id. 114:18-22.  Hurld Wyman awarded the Minor with a "citizenship award" for her positive performance.  See Uncontested Exs., Ex. 17, Hurld Wyman Wildcats Character Trait Award.  The Minor attends church with her cousins every Sunday.  Trial Tr. 114:23-25.  According to Nakato, the Minor is currently very happy in her situation and cries anytime Nakato mentions her possible return to the United Kingdom.  Id. 115:1-15.  The Minor has a local physician and dentist in Massachusetts and appears to be up to date on her medical care.  Id. 116:9-17.

Although Nakato has been authorized to work, she has yet to secure a job; Rafsanjan provides all financial support for Nakato and the Minor.  Id. 135:1-18.  Nakato currently does not possess a credit card but is an authorized user on Rafsanjan's credit card.  Id. 136:24-137:7.  Nakato claims that she is capable of supporting herself and the Minor financially through her savings, which amount to about $50,000; the money, however, is in Uganda.  Id. 135:19-136:9.  Nakato has applied for public assistance here in the United States; the Minor receives free school meals, and Nakato and the Minor are currently registered under MassHealth.  Id. 136:14-23.

III.   **RULINGS OF LAW**

A.   **Legal Standard**

The Hague Convention addresses "the problem of international child abductions during domestic disputes." Abbott v. Abbott, 560 U.S. 1, 8 (2010).  Its "core premise [is] that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence."  Monasky v. Taglieri, 140 S. Ct. 719, 723 (2020) (internal quotation marks and ellipsis omitted).  To that end, its "central operating feature is the return remedy."  Abbott, 560 U.S. at 9.  That is, the Convention sets forth a statutory framework "to secure the prompt return of children" under the age of sixteen who are "wrongfully removed to or retained in any Contracting State" unless an exception applies.  Hague Convention, arts. 1(a), 4, 13.  The United States has implemented the Convention through the International Child Abduction Act, which extends jurisdiction to federal courts over Hague Convention disputes, 22 U.S.C. § 9003(a), and provides that courts "shall decide [each] case in accordance with the Convention," id. § 9003(d).

The parties do not dispute that the Hague Convention applies to this case; the Minor is younger than sixteen years old, see Trial Tr. 17:4-16; Birth Certificate, and both the United States and the United Kingdom are signatories to the

[24]

Convention, see Hague Conference on Private Int'l Law,
Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child
Abduction, Status Table, https://www.hcch.net/en/instruments/
conventions/status-table/?cid=24.

In "adjudicating a dispute under the Convention," the Court
"must make two inquiries." Moura v. Cunha, 67 F. Supp. 3d 493,
497 (D. Mass. 2014). First, the Court undertakes "a threshold
inquiry as to whether the child was wrongfully removed from the
jurisdiction in which he or she was habitually resident." Id.
An answer in the affirmative "creates a presumption in favor of
return." Id. Second, the Court "evaluates whether any
exceptions apply that serve to rebut this presumption." Id.

   B.   **Threshold Inquiry**

At the first step, a petitioner seeking the return of a
child must "establish by a preponderance of the evidence . . .
that the child has been wrongfully removed or retained within
the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(a).
Article 3 of the Convention provides that a child's removal is
wrongful if:

> a) it is in breach of **rights of custody** attributed to
> a person, an institution or any other body, either
> jointly or alone, under the law of the State in which
> the child was **habitually resident** immediately before
> the removal or retention; and
>
> b) at the time of removal or retention those rights
> were **actually exercised**, either jointly or alone, or

would have been so exercised but for the removal or
retention.

Hague Convention, art. 3 (emphasis added).  Thus, to establish
wrongful removal, a "petitioner must show that he or she (1)
seeks to return the child to the child's country of habitual
residence, (2) had custody rights immediately prior to the
child's removal, and (3) was exercising those rights."  Mendez
v. May, 778 F.3d 337, 343 (1st Cir. 2015).

### 1.    Habitual Residence

First, to sustain his burden, Karim must show that the
Minor was "habitually resident" in the United Kingdom
"immediately before the removal."  Hague Convention, art. 3.

The Convention does not define "habitual residence" but
rather leaves it to each signatory State to interpret.  See id.;
Mendez, 778 F.3d at 344.  To ascertain a child's "habitual
residence" the First Circuit "looks first to the shared intent
or settled purpose of the persons entitled to determine the
child's permanent home; as a secondary factor, [it] may consider
the child's acclimatization to his or her current place of
residence," though "evidence of acclimatization alone cannot
establish a child's habitual residence in the face of shared
parental intent to the contrary."  Mendez, 778 F. 3d at 344.
Courts "look specifically to the latest moment of the parents'
shared intent, 'as the wishes of one parent alone are not

sufficient to change a child's habitual residence.'" <u>Mauvais</u> v. <u>Herisse</u>, 772 F.3d 6, 12 (1st Cir. 2014) (quoting <u>Neergaard-Colón</u> v. <u>Neergaard</u>, 752 F.3d 526, 531 (1st Cir. 2014)).  The parents need not intend for the child "to stay in the place indefinitely; it may be for a limited period."  <u>Darín</u> v. <u>Olivero-Huffman</u>, 746 F.3d 1, 11 (1st Cir. 2014) (internal quotation marks omitted).  This inquiry is "fact-driven." <u>Monasky</u>, 140 S. Ct. at 727.

Here, the Minor's "habitual residence" prior to removal was the United Kingdom.  Although born in the Netherlands, <u>see</u> Birth Certificate, the Minor moved with both her parents to England when she was just one year old, Trial Tr. 20:1-20, and has British citizenship, <u>id.</u> 20:23-25.  While the Minor took a trip with her mother to the United States in 2019, <u>id.</u> 34:6-35:25, the parents intended this trip to be temporary -- Karim testified that Nakato had told him the trip to the United States would only last a couple of weeks, <u>id.</u> 36:13-37:6.  Nakato returned with the Minor after five or six months, <u>id.</u> 38:1-15, and she, Karim, and the Minor resumed living together in Peterborough, England, <u>id.</u> 36:1-12, where the Minor attended school, <u>id.</u> 27:1-25, 28:1-29:4.

Although Karim agreed when Nakato told him she might move to Derby with the Minor, <u>id.</u> 56:3-21, Karim and Nakato's shared intent in the moments immediately preceding Nakato's removal of

the minor was nevertheless for the Minor to remain in the United Kingdom and live merely an hour from Karim, id. 54:13-55:6, 56:16-20, 74:8-9.  There is no indication, and Nakato does not allege, that Karim ever intended for the Minor to live permanently in the United States.  Nakato never informed Karim that she sought to move the Minor to the United States, nor did he consent to such a move.  See id. 54:10-14, 74:16-22.

Thus, Karim has shown that in taking the Minor out of the United Kingdom on September 1, 2020, id. 70:8-17, Nakato removed the Minor from her place of "habitual residence."

### 2.  Rights of Custody

Second, to establish a wrongful removal, Karim must show that the Minor was removed "in breach of rights of custody attributed to" him.  Hague Convention, art. 3.

Under Article 5 of the Hague Convention, custody rights "include rights relating to the care of the person of the child and, in particular, the **right to determine the child's place of residence** . . . ."  Id. art. 5(a) (emphasis added).  The Convention "provides no further definition of the term 'rights of custody,'" but "courts have commonly looked to the background report of the Convention for further guidance."  Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000).  According to the report, custody rights invoke "the law of the child's habitual residence" and derive from "all [sources] upon which a claim can

[28]

be based within the context of the legal system concerned."  Id.
(quoting Elisa Perez-Vera, Explanatory Report: Hague Conference
on Private International Law P 67, in 3 Acts and Documents of
the Fourteenth Session 426, 446).  Thus, the United Kingdom's
law determines Karim's custody rights but ought be interpreted
"in light of the Convention's basic principle that a child's
country of habitual residence is best placed to decide upon
questions of custody."  Id. at 456.

The United Kingdom Children Act of 1989 (the "Children
Act") "establishes all the law relating to the care and
upbringing of children in that country."  Haimdas v. Haimdas,
720 F. Supp. 2d 183, 201 (E.D.N.Y. 2010) (internal quotation
marks omitted).  The Children Act provides that "[w]here a
child's father and mother were married to each other at the time
of his birth, they shall each have **parental responsibility** for
the child."  Id. at 202 (quoting the Children Act § 2(1)).
"Parental responsibility" constitutes "all the rights, duties,
powers, responsibilities and authority which by law a parent of
a child has in relation to the child and his property" -- a
concept akin to "**custody**" as used in the Hague Convention.  Id.
(quoting the Children Act § 3(1)).  For that reason, "American
courts have interpreted Section 2 of the Children Act as
sufficient proof of de jure rights of custody for a Hague
Convention prima facie showing of wrongful retention or removal,

[29]

at least where no English court order negating the petitioner's parental responsibility is in effect." Id. (citing, inter alia, Morgan v. Morgan, 289 F. Supp. 2d 1067, 1069 (N.D. Iowa 2003); In re Robinson, 983 F. Supp. 1339, 1342 (D. Colo. 1997)).

Karim has shown that he has custody rights as to the Minor. Karim and Nakato were married by the Kibuli Mosque on September 12, 2013.  Trial Tr. 15:24-16:2; Marriage Certificate.  The Minor was born on January 17, 2014.  Trial Tr. 17:4-16; Birth Certificate.  Karim and Nakato's continued marriage allowed Nakato to secure a British "spousal visa" when they moved to the United Kingdom after the Minor was born.  Id. 23:9-24:5.  Thus, absent a subsequent divorce, Karim has "parental responsibility" for the Minor under the Children Act and therefore "custody" of the Minor for purposes of the Hague Convention.  See Children Act § 3(1); Haimdas, 720 F. Supp. 2d at 201.

Nakato claims that she and Karim divorced prior to her removal of the child.  Trial Tr. 86:21-25, 132:17-20.  As discussed, however, this Court does not credit Nakato's exhibits in support of this allegation -- the Kibuli Mosque Divorce Certificate and the Islamic Divorce Application Form -- and finds that Nakato and Karim remain married.  See supra section II.B.3.

Even were this Court to credit these exhibits, the Islamic Divorce Application Form by its own language only dissolves the

**religious union** between two married individuals; it does not resolve any disputes with regard to financial division of assets or **custody arrangements**.  See Kibuli Mosque Islamic Divorce Application Form 4; see also Trial Tr. 132:9-11 (Nakato conceding that she "never got a civil divorce").

Finally, Karim's application form with the International Child Abduction and Contact Unit is consistent with a finding of de jure custody, as Karim stated that he is "the legal father to [the Minor]," is listed on her birth certificate, and is her registered guardian in the United Kingdom.  See ICACU Appl. Form 10.

Thus, Karim has shown that he had custody rights of the Minor immediately prior to her removal.

### 3.   **Exercise of Custody Rights**

Third, Karim must prove not only that he had custody rights, but also that "at the time of removal . . . those rights were **actually exercised**, either jointly or alone, or would have been so exercised but for the removal."  Hague Convention, art. 3 (emphasis added).

The Convention leaves for signatory States to interpret the term "actually exercise[]."  See Krefter v. Wills, 623 F. Supp. 2d 125, 133 (D. Mass. 2009) (Saris, J.).  Courts in the United States "liberally find 'exercise' [of custody rights] whenever a parent with de jure custody rights keeps, or seeks to keep, any

sort of **regular contact** with his or her child." <u>Mendez</u> v. <u>May</u>, 85 F. Supp. 3d 539, 555 (D. Mass. 2015) (Sorokin, J.) (emphasis added), <u>rev'd on other grounds</u>, 778 F.3d 337 (1st Cir. 2015). Thus, courts only find a "failure to exercise custody rights on the part of someone with such rights where there were actions 'that constitute[d] clear and unequivocal abandonment of the child.'" <u>Id.</u> at 555 (quoting <u>Friedrich</u> v. <u>Friedrich</u>, 78 F.3d 1060, 1066 (6th Cir. 1996)).  Importantly, "'[o]nce it determines the parent exercised custody rights in any manner, the court should stop -- completely avoiding the question whether the parent exercised the custody rights well or badly.'" <u>Bader</u> v. <u>Kramer</u>, 484 F.3d 666, 671 (4th Cir. 2007) (quoting <u>Friedrich</u>, 78 F.3d at 1066).

Here, Karim was exercising his custody rights at the time the Minor was removed.

The entire time Karim, Nakato, and the Minor lived in England, Karim funded the accommodations and most financial needs of the Minor.  Trial Tr. 18:10-15, 25:23-26:3.  At all times, Karim and Nakato shared in supervision of the child: Nakato would do so during the day and Karim in the evenings. <u>Id.</u> 26:6-16.  Both performed typical parental duties like shopping for the Minor, cooking for her, bringing her to the doctor, and taking her to school (for Karim, on Wednesdays). <u>Id.</u> 31:1-18, 32:18-21, 29:5-29, 30:19-25.  Moreover, Karim

testified and provided photographs showing that he took the Minor to playgrounds and entertainment centers, brought her to see fireworks, and was teaching her to swim.  Id. 32:5-17; Photographs.

It is true that, during the time the family lived in England, Nakato took the Minor on two trips without Karim -- one to Uganda for three months in 2017 and the other to the United States for five or six months in 2019.  Trial Tr. 34:6-35:25, 107:19-21, 36:1-12.  Even assuming, however, as Nakato testified, that Karim did not check in on the Minor during the Uganda trip, id. 107:19-25, due to the active role Karim played in the Minor's life, these trips alone do not "constitute[] clear and unequivocal abandonment of the child," Mendez, 85 F. Supp. 3d at 555.  Indeed, Karim testified that Nakato had told him the United States trip would only last a couple of weeks and that he protested when she told him she was extending the trip. Trial Tr. 36:13-37:6, 37:9-25.  Moreover, when they returned, Karim, Nakato, and the Minor resumed living together.  Id. 38:1-15.  In fact, the night before Nakato removed the Minor, Karim, Nakato, and the Minor ate dinner together and all slept in the family home. Id. 72:2-10, 73:15-20.

Additionally, the fact Karim approved Nakato's move to Derby with the Minor does not show that Karim had "unequivocal[ly] abandon[ed]" the Minor, Mendez, 85 F. Supp. 3d

[33]

at 555; instead, the record indicates Karim planned actively to continue exercising custody.  He testified that he and Nakato had not discussed the specifics of the move but had agreed they would share time with the Minor.  Trial Tr. 70:15-18, 71:3-9. This was feasible, as Karim and Nakato's Peterborough home was only one hour from Derby.  Id. 74:8-9.  Moreover, Karim testified that when he first realized Nakato and the Minor were gone, he assumed they went to Derby, and emailed Nakato, asking her to call when she had settled in order to arrange splitting time with the Minor.  Id. 74:1-15.

Karim has therefore made the requisite threshold showing that the Minor was wrongfully removed.

C.   **Exceptions to the Mandate to Return the Child**

Since Karim has made a prima facie showing that the Minor was wrongfully removed, the burden shifts to Nakato to show that an exception applies.

Article 13 of the Hague Convention provides for three exceptions whereby a child's return is not mandated even though the child was wrongfully removed: first, where the petitioner "had consented to or subsequently acquiesced in the removal or retention"; second, where "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"; and third, where "there is a grave risk that his or her return would expose the

[34]

child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13.

Article 12 provides a fourth exception: where (1) more than one year has elapsed from the date of the wrongful removal to the date of the commencement of proceedings in the Contracting State and (2) "it is demonstrated that the child is now settled in its new environment."  Hague Convention, art. 12.

These exceptions "are to be construed narrowly," Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002), and "[t]his Court may exercise its discretion to order removal even if it is found that one or more of these defenses apply," De Aguiar Dias v. De Souza, 212 F. Supp. 3d 259, 270 (D. Mass. 2016) (Hillman, J.) (citing Hague Convention, art. 18).

At least to some extent, Nakato has raised each of the above affirmative defenses,[4] arguing that: (1) Karim consented to the Minor's removal, (2) the Minor objects to her return, (3) there is a grave risk the Minor's return would expose her to harm, and (4) more than one year has elapsed and the Minor is

---

[4] There is a fifth exception which has not been raised here. Article 20 of the Hague Convention provides that a child's return is not mandated if it "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Hague Convention, art. 12.  Nakato's failure to raise this affirmative defense renders it inapplicable.

well-settled in the United States.  The Court addresses each
exception in turn.

### 1.    Consent and Acquiescence

Nakato bears the burden to establish by a preponderance of
the evidence that Karim "consented to or subsequently acquiesced
in" the Minor's removal to the United States.  See Hague
Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

"Consent and acquiescence embody two separate defenses."
Darín, 746 F.3d at 14.  On the one hand, consent "involves the
petitioner's conduct **prior** to the contested removal or
retention"; on the other, "acquiescence addresses whether the
petitioner **subsequently** agreed to or accepted the removal or
retention."  Id. (quoting Baxter v. Baxter, 423 F.3d 363, 371
(3d Cir. 2005)).

As for the former, "[c]onsent may be evinced by the
petitioner's statements or conduct, which can be rather
informal."  Id.  "What the petitioner actually contemplated and
agreed to, as well as the nature and scope of the petitioner's
consent -- including any conditions or limitations -- should be
taken into account."  Darín, 746 F.3d at 15.  Relevant here,
"[c]onsenting to the child leaving the country for a limited
period of time does not equate with consenting to the child's
permanent relocation to another country."  Mendez, 85 F. Supp.
3d at 556.  Moreover, an allegation of consent may be "countered

[36]

by [the parent]'s prompt and persistent actions seeking [the child]'s return to" the country of habitual residence.  <u>Whallon</u>, 230 F.3d at 461.

As for the latter, "the defense of acquiescence pertains only to what happened post-retention."  <u>Darín</u>, 746 F.3d at 16. Compared to consent, "[a]cquiescence tends to require more formality," such as "testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time."  <u>Id.</u>  Where the conduct of the parent alleged to have acquiesced is ambiguous, "courts employ a pure subjective intent inquiry."  <u>Id.</u>

Nakato has failed to show that Karim either consented or acquiesced to the Minor's removal.

First, there are only three events that could possibly indicate **consent**: (1) the Minor's trip with Nakato to Uganda for three months in 2017; (2) the Minor's trip with Nakato to the United States in 2019 for six months; and (3) Karim's agreement to allow the Minor to live with her mother in Derby.  This section will discuss each.

The Uganda trip predated the Minor's removal by more than three years.  Trial Tr. 34:6-35:25.  It, therefore, has little bearing on assessing Karim's possible consent to the child's removal in 2020.  The father's level of contact with the child during this trip -- whether rare or frequent, <u>see</u> <u>id.</u> 107:19-25

[37]

(claiming Karim did not call or check in on the child during
this trip) -- is of no consequence.  At this time the family was
living together in England, and there was no indication that
Nakato intended to leave the family home, let alone remove the
child from Karim.  Id. 30:17-18.

Nakato and the Minor's trip to the United States was far
more proximate -- starting a little over a year before her
ultimate removal and lasting six months.  Id. 36:1-12.  Karim,
however, has provided credible testimony establishing that he
did not consent to such an extended trip.  In fact, Karim stated
that Nakato told him the trip would only last a couple of weeks,
that she notified him of her plans to extend the trip only once
she was already in the United States and the two-week span had
elapsed, and that he raised concerns with Nakato about her
overstaying her visitor's visa and asked her to return when
planned.  Id. 36:13-37:25.  This Court must take into account
the limited nature and scope of Karim's consent.  Darín, 746
F.3d at 15.  The evidence indicates Karim consented to his child
taking a brief trip with her mother to visit a friend.  The fact
that it turned into a six-month interlude in preparation for
Nakato's ultimate removal of the Minor does not alter this
Court's conclusions.

Finally, Karim concedes that he had agreed to allow the
Minor to live in Derby with her mother and attend school there.

Trial Tr. 56:3-21.  Derby is located one hour away from Karim's residence and would entail the Minor living without Karim for at least part of the time.  Id.  It is again imperative, however, that this Court take into account the scope of Karim's agreement in assessing whether this constitutes consent: (1) Karim agreed for the minor to live part time with her mother, in the United Kingdom, and at driving distance from his residence; and (2) he stated that he and Nakato would split time with the minor "amicably."  Id. 70:15-18, 71:3-9, 74:1-15.  This is far different from consenting to the child being removed to the United States permanently, with no capacity for visitation, limited contact, and virtually no opportunity to maintain a consistent relationship.

In brief, neither the trips, nor the Minor's relocation to Derby, could constitute consent, as Karim only agreed to the child traveling or residing apart from him for a limited period and not to her permanent removal.

Second, only one event could possibly indicate **acquiescence**: Karim's initial failure to ascertain the Minor's absence from the United Kingdom.  As Karim concedes, he and Nakato had no concrete plans for her move to Derby; yet, he assumed that is where Nakato had taken the minor.  Id. 70:15-18, 71:3-9, 74:1-15.  Furthermore, it was the head teacher from Lime

Academy's intervention that led to the first police contact and efforts to establish the Minor's whereabouts.  Id. 58:1-25.

Nevertheless, Karim's actions do not rise to the level of acquiescence as they are countered by at least two factors: (1) Karim's assumption that Nakato had taken the child to Derby and not abroad was reasonable, id. 55:11-23; and (2) when Karim initially discussed fears of abduction with the police, they assuaged his concerns, id. 63:1-14.

Furthermore, as soon as he discovered the removal, Karim made active efforts to recover the Minor: he tried contacting Nakato multiple times, id. 59:13-25; he asked police to investigate, id. 62:19-25; he obtained and provided authorities concrete proof of his child's presence in the United States through Facebook pictures, id. 63:10-25; and he filed an International Child Abduction and Contact Unit Application, id.; see also ICACU Appl. Form.  Therefore, the evidence does not support that Karim in any way acquiesced to the Minor's removal.

Thus, the consent and acquiescence exceptions do not apply to this case.

### 2.   **Mature Child Objection**

To invoke the "age and maturity" exception, Nakato must show by a preponderance of the evidence that the Minor "**objects to being returned and has attained an age and degree of maturity**

at which it is appropriate to take account of its views."  Hague
Convention, art. 13 (emphasis added); 22 U.S.C. § 9003(e)(2)(B).

The "'age and maturity' exception is to be applied
narrowly."  Gonzalez Locicero v. Nazor Lurashi, 321 F. Supp. 2d
295, 298 (D.P.R. 2004) (Laffitte, J.).  As for the objection,
the respondent's burden is not fulfilled by the child's mere
"[e]xpression of a **preference** to remain in the respondent's
country."  Falk v. Sinclair, 692 F. Supp. 2d 147, 165 (D. Me.
2009); see also Gonzalez Locicero, 321 F. Supp. 2d at 298 ("The
fact that the child prefers to remain in Puerto Rico, because he
has good grades, has friends and enjoys sport activities and
outings, is not enough for this Court to disregard the
narrowness of the age and maturity exception to the Convention's
rule of mandatory return.").  In assessing the child's
objection, "a court should also consider whether a child's
desire to remain or return to a place is 'the product of undue
influence,' in which case the 'child's wishes' should not be
considered."  Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279
(3d Cir. 2007) (quoting De Silva v. Pitts, 481 F.3d 1279, 1286
(10th Cir. 2007)).  As for maturity, "[t]he Convention does not
set an age at which a child is automatically considered to be
sufficiently mature, rather the determination is to be made on a
case by case basis."  De Aguiar Dias, 212 F. Supp. 3d at 271.

[41]

Nakato failed to meet her burden as to either the Minor's objection or the Minor's maturity.

As to whether the Minor objects to being returned, the only evidence raised at trial was Nakato's testimony that the Minor cries whenever Nakato mentions moving back to England or living with Karim.  Trial Tr. 115:10-14.  Nakato provides no other evidence of the Minor's preference.  Moreover, even if genuine, this preference alone is insufficient establish the applicability of this exception, see Sinclair, 692 F. Supp. 2d at 165, and may have been a product of Nakato's influence, see Fu-Chiang Tsui, 499 F.3d at 279.

As to maturity, the Minor is eight years old, Trial Tr. 17:4-16, but Nakato has failed to adduce any evidence to indicate that she is sufficiently mature to weigh in on her possible return.  Furthermore, at no point during these proceedings did Nakato request that the child testify.

Thus, "[t]o hold that this defense applies would involve assuming both the child's present objection and the content of the child's views based solely upon representations by the party opposing return" -- such an assumption "would be inconsistent with the narrowness of the age and maturity exception to the Convention's rule of mandatory return."  De Aguiar Dias, 212 F. Supp. 3d at 272 (internal quotation marks omitted).

### 3.   Grave Risk of Harm

Nakato bears the burden to show by clear and convincing evidence "a grave risk that" returning the Minor to the United Kingdom "would expose [her] to physical or psychological harm or otherwise place [her] in an intolerable situation." See Hague Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A).

The risk of harm cannot "be low," but "[t]he Convention does not require that [it] be 'immediate'; only that it be grave." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000). As for the harm itself, it "must be a great deal more than minimal." Id. That is, it "must be something greater than would normally be expected on taking a child away from one parent and passing him to another; otherwise, the goals of the Convention could be easily circumvented." Id. (internal quotation marks omitted). Questions of "who is the better parent in the long run, or whether the absconding parent had good reason to leave her home and terminate her marriage" are immaterial to this determination. Id. (citing Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995)) (brackets and ellipsis omitted).

With respect to the issue of spousal abuse, the First Circuit has "recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." Walsh, 221 F.3d at 220.

Indeed, the First Circuit acknowledges that "credible social science literature establishes that serial spousal abusers are also likely to be child abusers," and further considers evidence that a child has witnessed and would continue to witness a parent's violent assaults as weighing in favor of the grave risk exception.  Id.

Here, Nakato fails to show a grave risk that the Minor's return would expose her to harm.

Given the extensive inconsistencies, the Court cannot credit Nakato's allegations of physical abuse.  See supra II.C.3.  While the Court does not doubt there was mistreatment, and certainly does not condone Karim's actions in, for example, locking Nakato in a room during an altercation, Trial Tr. 79:25, this conduct does not sufficiently expose the Minor to a "grave risk" of harm; it is simply not enough to justify "taking a child away from one parent and passing [her] to another," Walsh, 221 F.3d at 218 -- at least without custody proceedings.

Furthermore, Nakato has never testified or alleged that Karim is a direct risk of harm to the Minor.  Therefore, Nakato has failed to carry her substantial burden of showing that the child would be at grave risk of harm if returned to her home country, so the exception does not apply.

### 4.    One Year Delay and Well-Settled Child

To establish the well-settled child exception, Nakato must prove by a preponderance of the evidence that (1) more than one year elapsed between the Minor's removal to the United States and Karim's commencement of this action and (2) the Minor "is now settled in its new environment."  Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B).

In determining whether a child is well-settled, courts often draw from "a State Department Legal Analysis issued in conjunction with the adaptation of the Convention, which concluded that 'nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof.'"  Moura, 67 F. Supp. 3d at 499 (quoting Hague Int'l Child Abduction Convention; Text & Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986)).  Courts consider numerous factors, the "most important" of which are "the length and stability of the child's residence in the new environment." Id. at 500 (quoting In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)).  Factors that may merit consideration include:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

Id. (quoting In re B. Del C.S.B., 559 F.3d at 1009).
Additionally, courts may take into account immigration status,
as well as "the amount of time a child has spent in the country,
. . . their academic performance, social networks and
relationships, and, under some circumstances, country of
citizenship." Id.

Even if a court finds that one year has passed and the
minor is well-settled, it "has discretionary power to determine
whether the defense justifies return." Moura, 67 F. Supp. 3d at
499.

Here, Karim filed suit on September 7, 2021, and the record
indicates Nakato removed the Minor from the United Kingdom on
September 1, 2020. Trial Tr. 70:8-17. Thus, the Court assumes
that more than one year has passed. Nevertheless, Nakato has
failed to establish by a preponderance of the evidence that the
Minor is well-settled.

Nakato indicated at trial that the Minor has resided in the
United States for nearly two years now, attends school at Hurld
Wyman Elementary School, is performing well in school, has
friends and cousins in the area, and attends church every Sunday
with family. Id. 114:16-17, 114:18-22, 114:23-25.

Nakato has failed, however, to meet her burden by a
preponderance of the evidence for several reasons. First,

Nakato provides no further evidence to establish that the child is well-settled and there is no indication that the child was not performing well in school in England or was not in contact with friends and family while there.  Second, Nakato and the Minor do not have their own place of residence in the United States; they reside with Nakato's boyfriend, Rafsanjan.  Id. 120:19-23.  Third, Nakato and the Minor rely entirely on Rafsanjan for their financial stability: Rafsanjan pays for their food and living expenses and Nakato uses Rafsanjan's credit card for everyday purchases.  Id. 135:1-18, 136:24-137:7. Although Nakato claims that she is capable of providing for herself and the Minor financially, she is currently unemployed and, by her admission, her only funds are in Uganda.  Id. 135:1-136:9.  In fact, Nakato currently relies, in part, on Massachusetts public assistance for basic needs.  Id. 136:14-23. Fourth, Nakato and the Minor's immigration status in the United States is uncertain.  While Nakato has applied for asylum, both for herself and on behalf of the Minor, see Asylum Appl. 2, neither has yet been granted asylum; the Minor does, however, still possess British citizenship and a British passport, Trial Tr. 20:23-25, 24:8-20, 117:8-11, 134:19-25.

Therefore, the well-settled child exception also does not apply to this case.

IV.    **CONCLUSION**

For these reasons, the Court rules that Nakato wrongfully removed the Minor to the United States and that no exception applies.  Thus, pursuant to the Hague Convention and the International Child Abduction Remedies Act, the Court orders that the Minor be returned to Karim's custody in the United Kingdom within thirty days of May 20, 2022.


**SO ORDERED.**



                                        /s/ William G. Young
                                         WILLIAM G. YOUNG
                                              JUDGE
                                             of the
                                         UNITED STATES[5]

_____

[5] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.